**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TERRY DAUM,

                                    Plaintiff,

                - v -                                    Civ. No. 9:15-CV-1083
                                                              (DNH/DJS)

CAPT. STEVEN RACETTE, et. al.,

                                    Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

TERRY DAUM
Plaintiff, *Pro Se*
97-A-1295
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

HON. BARBARA D. UNDERWOOD              MARK G. MITCHELL, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

On September 4, 2015, *pro se* Plaintiff Terry Daum commenced this civil rights

action, pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights while he

was in the custody of the New York State Department of Corrections and Community

Supervision ("DOCCS").  Dkt. No. 1, Compl.  Presently before the Court is Defendants'

Motion for Summary Judgment.  Dkt. No. 86, Defs.' Mot. Summ. J.  Plaintiff has filed a

Response and a Sur-Reply.  Dkt. Nos. 92 & 95.  Defendants filed a Reply.  Dkt. No. 93,

Defs.' Reply.  For the reasons that follow, it is recommended that Defendants' Motion be

**granted in part and denied in part**.

## I. BACKGROUND

### A. Facts

#### 1. Use of Force

Unless otherwise stated, the following factual recitation is undisputed.[1]  The events

of this action occurred when Plaintiff was incarcerated in the B Block at Clinton Correctional

Facility ("Clinton C.F.").  Dkt. No. 86-2, Pl.'s Dep., p. 21.  On April 3, 2014, a multi-man

fight occurred in the North Yard at Clinton C.F.  Dkt. No. 86-10, Stickney Decl., ¶ 5.  As a

result, increased security measures were instituted, including pat frisks of inmates entering

the yard in the area called "the flats."  *Id*.  According to Plaintiff, he called and complained

to his brother regarding what he believed to be an improper and sexually abusive pat frisk

by Defendant Corrections Officer Chad Stickney while Plaintiff was in the yard.  Dkt. No.

30., Am. Compl., ¶ 14.  That phone call was made on April 4, 2014 at approximately 9:15

---

[1] Defendants filed a Statement of Material Facts. Plaintiff responded and admits the facts contained in certain paragraphs of Defendants' Statement of Material Facts. Additionally, the parties annexed exhibits to their submissions, without objection relating to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits in the context of the within Motion. *See U.S. v. Painting known as Hannibal*, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel v. UnumProvident Corp.*, 261 Fed. Appx. 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party")). In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in the non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

p.m., and Plaintiff believes that his brother reported the event to the Facility at 9:45 that night. *Id.*

Thereafter, at approximately 10:00 p.m., Plaintiff was escorted downstairs to "the flats." Pl.'s Dep. at pp. 36 & 48. Defendant Stickney met Plaintiff at the bottom of the stairs and put him against the wall for a pat frisk. *Id.* at p. 60. Stickney's search included a "credit card swipe" which Plaintiff described as a search that involves using "full hands [] up [his] rectum aggressively." *Id.* at pp. 65-66. Stickney placed Plaintiff in an "arm bar" and "forced" him into an interview room for a conversation with Defendant Captain Patrick Devlin.[2] *Id.* at pp. 71-72. Defendant Deputy Superintendent of Security Stephen Brown assigned Defendant Devlin to interview Plaintiff and investigate the complaints regarding the manner in which Plaintiff was pat-frisked in the yard that had been communicated to the facility through Plaintiff's family. Dkt. No. 86-11, Brown Decl., ¶ 5; Dkt. No. 86-5, Devlin Decl., ¶ 6; Pl.'s Dep. at pp. 72-74, 115, & 154-155.

Defendant Devlin states that Plaintiff told him that he "did not care for the way he was pat frisked before he entered the yard." Devlin Decl. at ¶ 6. Defendant Devlin claims that the interview ended and Plaintiff was escorted to his cell, without incident. *Id.* at ¶¶ 6 & 8. Plaintiff claims that he was "angry" and told Defendant Devlin that Defendant Stickney sexually assaulted him and stated, with expletives, "I am being violated right in front of you." Pl.'s Dep. at pp. 77-78 & 108. Plaintiff claims that Defendant Devlin stood up and stated,

---

[2] Stickney claims that he "did not assault Plaintiff" and conducted himself in a manner consistent with DOCCS' regulations. Stickney Decl. at ¶¶ 7-8.

"I'm not here for this." *Id*. at pp. 78-79. Plaintiff alleges that when Defendant Devlin stood up, Defendant Stickney and other unidentified officers assaulted Plaintiff in the interview room, while Defendant Devlin was present. *Id*. at pp. 79-81 & 84. Plaintiff claims that he was "slammed . . . face first" into a locker, punched with closed fists, and repeatedly beaten in the ribs, head, neck, and face. *Id*. at pp. 79-91. Plaintiff testified that he was knocked to the ground and asserts that Defendant Stickney continued to beat him and kick him while he was on the floor. *Id*. at pp. 90-97.

After five minutes, Plaintiff alleges he was pulled to his feet and escorted from the interview room. *Id.* at pp. 99 & 103. As he exited the interview room, Plaintiff claims he saw Defendant Corrections Officer John Cross standing near the interview room on B Block. *Id.* at p. 103. Plaintiff testified that Defendant Cross told him to stop filing complaints and "smacked" him.[3] *Id*. at pp. 103-109. Defendant Cross then directed Defendant Stickney to return Plaintiff to his cell. *Id*. at p. 113. Defendant Cross disputes this account and contends that he was not present on B Block that evening. Dkt. No. 86-9, Cross Decl., ¶ 5.

Defendant Stickney and other unidentified officers escorted Plaintiff back to his cell. Pl.'s Dep. at pp. 118-19. Plaintiff asserts that he was "pinned down" on his mattress and repeatedly punched in the lower back. *Id*. Plaintiff remained in his cell on "lockdown" from April 4, 2014 until April 7, 2014. *Id.* at p. 120.

On April 7, 2014, Defendant Devlin sent a memorandum to Defendant Brown

---

[3] Plaintiff testified that he believed that Cross was referring to the complaints against Stickney related to "credit card swipes." Pl.'s Dep. at p. 106.

—

regarding his interview with Plaintiff. Devlin Decl. at ¶ 6, Ex. A. Defendant Devlin concluded that Plaintiff ". . . made up the complaint and had his family call the facility because the yard run was running late due to the extra security precautions that were taking place." *Id*.

### 2. *Placement in Involuntary Protective Custody*

On April 7, 2014, Defendant Lieutenant Martin Snow interviewed Plaintiff and escorted him to the medical department for an examination. Dkt. No. 86-20, Snow Decl., at ¶¶ 5, 6. Defendant Snow claims that Plaintiff told him that he "slipped [and] fell on the flats." *Id*. at ¶¶ 6 & 7, Ex. B. Plaintiff contends that he told Defendant Snow that he was attacked by officers in Defendant Devlin's presence. Pl.'s Dep. at pp. 127-128. Plaintiff claims that when he arrived at the examination room, he told the nurse, in the presence of Defendant Snow, that he was attacked on April 4, 2014 in B Block. *Id*. at p. 132. When the nurse asked Plaintiff to identify the assailants, Plaintiff stated, "I'm not saying." *Id*. Defendant Snow claims that Plaintiff told the nurse that he "slipped and fell on the flats." Snow Decl. at ¶ 6. Plaintiff complained of pain in his rib cage. Dkt. No. 92-3, Exs. to Pl.'s Supp. Resp., at p. 18.[4] The nurse prepared an Injury Report and wrote that Plaintiff "states he fell, 'I slipped & fell on the flats.'" *Id*. at p. 13. Defendant Snow reported his account of the interview and a summary of the medical examination to Defendant Brown in a memorandum dated April 7, 2014. Snow Decl., Ex. B.

---

[4] Citations to the Exhibits in this document are to the pagination provided by the Court's CM/ECF system.

On April 7, 2014, Defendant Snow prepared an Involuntary Protective Custody ("IPC")[5] Recommendation:

> Inmate Daum 97A1295 states he slipped and fell on Friday 4/4/14. He did not report the injury till 4/7/14 Monday. He had bruising which he could not explain. IPC recommended due to being unable to determine if he fell or involved in an altercation with another inmate.

Snow Decl. at ¶ 10, Ex. C.

Plaintiff refused to voluntarily accept protective custody status. Snow Decl. at ¶ 11, Ex. D at p. 1. Defendant Snow ordered Plaintiff confined to IPC pending a determination on the recommendation. Snow Decl., Ex. C.

On April 21, 2014, Commissioner's Hearing Officer Steven Bullis presided over an IPC hearing to determine if Plaintiff qualified for placement in IPC. Dkt. No. 86-17, Bullis Decl., ¶ 7. During the hearing, Plaintiff testified that he was attacked by officers on April 4, 2014. Exs. to Pl.'s Supp. Resp. at p. 31. Defendant Bullis told Plaintiff that he would send an email to the Superintendent advising him of Plaintiff's claim. *Id.* Defendant Bullis issued a written disposition concluding that substantial evidence supported Defendant Snow's IPC recommendation to "restrict[] [Plaintiff] from the general inmate population for [his] own protection[.]" Bullis Decl. at ¶ 7, Ex. A at p. 2. Defendant Bullis' determination

---

[5] Pursuant to Departmental Directive No. 4948, IPC is provided for "an inmate who may be a potential victim or a witness likely to be intimidated or who lacks the ability to live in the general facility community and who may, for good cause, be restricted from communication with the general inmate population and who does not voluntarily accept admission into Protective Custody Status. When an inmate is recommended for IPC status, the Directive provides that the inmate, "shall have a hearing conducted within 14 days, to determine the need for Protective Custody admission." Dkt. No. 86-17, Bullis Decl., ¶ 5.

was affirmed on administrative appeal. *Id*. at ¶ 9, Ex. B.   On April 21, 2014, Defendant Bullis sent an email to Defendant Superintendent of Clinton C.F. Steven Racette advising that Plaintiff claimed that he was assaulted by staff.  Dkt. No. 85-13, Racette Decl., Ex. C.

### 3. *Plaintiff's Complaints and the Destruction of His Boots*

On April 9, 2014, Defendant Devlin sent a memorandum to Defendant Brown indicating that he interviewed Plaintiff on April 4, 2014 related to complaints that he was sexually harassed during pat frisks in the yard.  Devlin Decl., Ex. C.  Defendant Devlin reported that the interview and escort to Plaintiff's cell were "without incident" and asserted that Plaintiff was not assaulted by any staff.  *Id.*

On April 14, 2014, while Plaintiff was in IPC pending his hearing, an unidentified officer advised Plaintiff that a package containing a pair of Timberland boots arrived, but the officer refused to deliver the package.[6]  Brown Decl., Ex. A at pp. 15-16.  On April 29, 2014, Plaintiff wrote a letter to the Defendant Racette.  *Id.*  Plaintiff listed various complaints including a claim that he was sexually assaulted on April 4, 2014, his grievances were being discarded, and that his mail and packages were being improperly withheld.  *Id.*  Plaintiff also alleged that the mail room refused to deliver his boots in retaliation for the incident that occurred on April 4, 2014.  *Id.*

On May 2, 2014, Defendant Brown sent a letter to the Inspector General's Office related to a Prison Rape Elimination Act ("PREA") complaint lodged by Plaintiff.  Exs. to

---

[6] Prior to being confined in IPC, Plaintiff mailed a pair of boots to the Timberland Company to be replaced. Pl.'s Dep. at pp. 178-79.

Pl.'s Supp. Resp. at p. 38.  Defendant Brown reported:

> The complaint regarding the above named inmate was investigated and turned over to L. Cianfrocco at the Inspector General's Office.  No further action is required.

*Id.*

On May 2, 2014, Defendant Racette sent a memorandum to Plaintiff indicating that his complaints, including those regarding his boots, were referred to Defendant Brown and Deputy Superintendent for Programs, J. Proulx.  Exs. to Pl.'s Supp. Resp. at p. 62.  Defendant Brown assigned Sergeant McCasland to investigate.  Brown Decl. at ¶ 9, Ex. A. at pp. 13-14.  Sergeant McCasland informed Plaintiff that he could not have the replacement boots.  Pl.'s Dep. at p. 180.

On May 8, 2014, Sergeant McCasland reported to Defendant Brown:

> I investigated the above complaint in regards to inmate Daum's 97A1295 boots being denied in the Package Room.  I spoke to Officer R. Tourville, he stated that the boots had a metal shank inside the sole when x-rayed and activated the Adams hand scanner when it was ran [sic] over the sole of the boots.  I interviewed inmate Daum 97A1295 and explained that the boots weren't allowed into the facility because they had a metal shank in the sole; his argu[]ment was that the boots he sent out for repair didn't have a metal shank.  What he failed to understand was that Timberland boots have a lifetime warranty, so boots sent out for warranty work are replaced through Timberland with a new pair and you have to request through the company to have the metal shanks removed prior to shipment.  Inmate Daum was argumentative and didn't want to listen to the proper way of having his boots fixed and refused on two occasions to designate what process he wanted done on the 2068 form and to sign the form or his package room card.  The 2068 form was filled out by myself and designated for disposal due to Inmate Daum 97A1295

> failure to comply with direction from staff and volunteering to
> sign the 2068 form and determine on his own what he wanted
> done with the Timberland boots.  The 30 day designation for
> inmate refusal and to have the package destroyed will be effective
> on 05/10/14 and the boots will be destroyed on this date.[7]

Brown Decl. at ¶ 10, Ex. A. at p. 12.

On May 20, 2014, Plaintiff wrote to Defendant Racette claiming that the boots did not contain metal and asked that Defendant Racette direct the package room to deliver the boots. Brown Decl. at ¶ 12, Ex. A. at p. 11.  On May 23, 2014, Defendant Racette sent a memorandum to Plaintiff indicating that his complaints were referred to Defendant Brown. *Id*., Ex. A. at p. 10. On May 29, 2014, Defendant Brown responded to Plaintiff advising that he personally inspected the boots and determined that the boots contained metal and were not permitted.  *Id.* at ¶ 13, Ex. A at p. 9.  On June 4, 2014, Plaintiff sent a memorandum to Defendant Brown indicating that he wanted to mail the boots home:

> You sent me a letter saying that I can't have the boots I ordered.
> Although I didn't "order" those boots since I initially mailed them
> out for repair/replacement, can I mail them home?  If [sic] fact, I
> would like to mail the[m] home since I can't have them.  I would
> appreciate that you direct the package room for processing.
> Thank you.

*Id*., Ex. A. at p. 4.

On June 6, 2014, Sergeant McCasland reported to Defendant Brown:

> In response to the above mentioned request, inmate Daum
> 97A1295 was afforded to [sic] opportunities to dispose of his

---

[7] Plaintiff contends that McCasland's report is inaccurate.  Dkt. No. 92, Pl.'s Resp. to Defendants' Statement of Material Facts, ¶ 36.

> Timberland boots in the proper manner.  Inmate Daum 97A1295 refused to comply with the proper standards afforded to him and the boots were destroyed after the proper grace period when inmate refused to sign the 2068 form.

*Id.* at ¶ 15, Ex. A. at p. 3.

On June 9, 2014, Defendant Brown wrote to Plaintiff:

> I have received your recent communication dated 6/4/14 requesting that you be allowed to mail home your Timberland boots in my office for review and a response.
>
> Due to your refusal to dispose of your boots in a proper manner, the boots have been destroyed in accordance to directive.

*Id.* at ¶ 16, Ex. A at p. 2.

On June 10, 2014, Plaintiff sent a letter to Defendant Racette claiming that Defendant Brown retaliated against him by destroying his personal property.   Exs. to Pl.'s Supp. Resp. at p. 71.  Plaintiff alleged in his letter that Defendant Brown violated DOCCS' Directives and retaliated against him for his complaints related to the April 4, 2014 incident.  *Id*.

On July 8, 2014, Plaintiff was transferred out of Clinton C.F.

## B.  Procedural History

On September 4, 2015, Plaintiff filed the Complaint in the within action.  Dkt. No. 1. On September 20, 2016, Plaintiff's Amended Complaint was accepted as the operative pleading.  Upon review of the Amended Complaint, the Court directed the defendants to respond to the following:  (1) Eighth Amendment excessive force claim against Stickney; (2) Eighth Amendment failure-to-protect claims against Devlin and Cross; (3) First Amendment

retaliation claims against Stickney, Devlin, Cross, Snow, Bullis, and Brown; and (4) supervisory claims against Racette. Dkt. No. 29. On November 17, 2016, Defendants filed an Answer. Dkt. No. 37. On January 24, 2017, Plaintiff appeared at a deposition. Dkt. No. 86-2. On March 23, 2018, Defendants filed this Motion pursuant to Federal Rule of Civil Procedure 56 seeking judgment as a matter of law. Dkt. No. 86. Plaintiff opposes the Motion. Dkt. No. 92.

## II.  LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . .

they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendants seek summary judgment on the bases that: (1) Plaintiff failed to exhaust his administrative remedies; (2) there are no disputed issues of material fact precluding summary judgment on Plaintiff's excessive force claims; (3) there are no disputed issues of material fact precluding summary judgment on Plaintiff's retaliation claims; (4) Plaintiff failed to establish that Defendant Racette was personally involved in any alleged constitutional violations; and (5) Defendants are entitled to qualified immunity.  Dkt. No. 86-28, Defs.' Mem. of Law, at p. 3.

### A.  Exhaustion

#### 1.  Exhaustion Procedure[8]

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and

---

[8] On May 15, 2014, DOCCS issued a Revised Directive regarding complaints of sexual abuse and sexual harassment, which Directive states that an inmate is *not* required to exhaust his administrative remedies before bringing a lawsuit concerning an alleged incident of sexual abuse, so long as official documentation confirms that he or she reported the abuse.  *Henderson v. Annucci*, 2016 WL 3039687, at *6 (W.D.N.Y. March 14, 2016) (citing Amended Directive 4040).  Plaintiff's claims in the present lawsuit arises out of the event which occurred on or about April 4, 2014, and thus predate the effect of the Revised Directive.  Accordingly, Plaintiff was required to exhaust utilizing the typical inmate grievance process.  *Id.*

whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted).   Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id*. at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement).   Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).   The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).[9]

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP").   First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(b).   An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id*. at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id*. at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id*. at § 701.5(b).   Second, upon appeal of the IGRC decision, the

---

[9] Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999).   Defendants properly raised the affirmative defense in their Answer to the Amended Complaint. Dkt. No. 37 at ¶ 16.

superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id*. at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### 2. Plaintiff's Failure to Exhaust Administrative Remedies

At the time of the relevant events of this action, Clinton C.F. had a grievance program. Dkt. No. 95, Pl.'s Sur-Reply, ¶ 3; Pl.'s Dep. at p. 205; Dkt. No 86-26, Brousseau Decl. at ¶ 6. Plaintiff never filed a grievance regarding the claims in the Amended Complaint. Brousseau Decl. at ¶¶ 5 & 8. Tara Brousseau, the Inmate Grievance Program Supervisor at Clinton C.F., stated "I have determined that the Clinton Inmate Grievance Program has no record of any grievance filed by plaintiff Daum [] relating to any issue identified in paragraph 5 allegedly occurring at Clinton in 2014." *Id.* Moreover, there is no record that Plaintiff appealed a grievance relative to the claims asserted in the Amended Complaint to the Central Office Review Committee. Dkt. No. 86-24, Seguin Decl., ¶ 17. As there is no dispute that Plaintiff failed to exhaust his administrative remedies, the Court must assess whether administrative remedies were available to Plaintiff.

### 3. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S.Ct. at 1858. As the Supreme Court stated, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id*. The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1858-61.

### a. Claims Against Stickney, Devlin, Cross, Snow, and Brown

Plaintiff argues that he attempted to file grievances related to the April 4, 2014 incidents and the destruction of his personal property, but staff members "sifted" through his mail and intercepted his grievances. Dkt. No. 92-2, Pl.'s Supp. Resp. to Motion, ¶¶ 39-45; Pl.'s Sur-Reply at ¶¶ 3-12; Pl.'s Dep. at p. 220. Plaintiff also claims that he did not receive guidance on how to pursue administrative remedies when a grievance was unfiled and unanswered. *Id.* Thus, Plaintiff maintains that the grievance process operated as a "dead end." *Id.* Defendants claim that Plaintiff's allegations are conclusory and unsupported by admissible evidence. *See* Defs.' Reply Mem. of Law at p. 4. An analysis of the exhaustion issue requires a discussion of the following letters and documents contained in the record:

*-16-*

- On April 10, 2014, while confined in the IPC, Plaintiff wrote a letter and addressed it to the Inmate Grievance Resolution Committee. Plaintiff claimed that he was sexually harassed and violated during a pat frisk and assaulted on April 4, 2014 by officers in the presence of a captain and placed in IPC. Dkt. No. 41-2 at p. 1.[10] Plaintiff gave the April 10, 2014 letter to an inmate/porter to mail in the facility approved mailbox. Exs. to Pl.'s Supp. Resp. at pp. 45 & 51-52. Inmate/Porter Gary Bowen provided an affidavit and states that he "was advised to not talk, assist, or mail any mail for [Plaintiff]." *Id.* at 51.

- On April 17, 2014, Plaintiff wrote a letter to C. Gregory, the Inmate Grievance Program Supervisor, inquiring about the status of his grievance. *Id.* at p. 53. Plaintiff gave this letter to an inmate/porter to mail. *Id.* at p. 45.

- On April 19, 2014, Plaintiff wrote a letter to the "Inmate Grievance Clerk" with complaints related to his boots. *Id.* at p. 54. Plaintiff gave his letter to an inmate/porter to mail. *Id.* at p. 45.

- On April 21, 2014, Plaintiff received a response from Gregory, dated April 18, 2014, stating, "[t]here are no grievances on file for . . . the year 2014 concerning alleged sexual harassment. You may submit the complaint if it is within the 21 day time frame." *Id.* at pp. 45 & 55.

- On April 21, 2014, pursuant to Gregory's directive, Plaintiff re-wrote his grievance complaining of sexual harassment, assault, and IPC confinement and personally placed the grievance in the facility approved mailbox. *Id.* at pp. 46 & 56-57.

- On April 23, 2014, Plaintiff sent a letter to Gregory, inquiring about the status of his two grievances. *Id.* at p.

---

[10] The April 10, 2014 letter was not included in the exhibits attached to Plaintiff's Affidavit. Plaintiff explained that the document was missing from his cell; however, a copy of the letter was previously annexed as an Exhibit to Plaintiff's February 2017 Motion to Compel. Dkt. No. 41-2; Exs. to Pl.'s Supp. Resp. at p. 50.

58.

- On April 28, 2014, Gregory responded, "[t]here are no grievances on file for . . . the year 2014 concerning a package or alleged sexual abuse and assault. You may submit the complaint if it is within the 21 day time frame." *Id.* at p. 59.

- On April 29, 2014, Plaintiff wrote to Defendant Racette and to Commissioner Anthony Annucci and claimed that Gregory refused to process his grievances. *Id.* at pp. 60-61 & 77-78. Plaintiff listed various complaints including a claim that he was sexually assaulted on April 4, 2014, his grievances were being discarded, and that his mail and packages were being improperly withheld. *Id.* Plaintiff alleged that the mail room refused to deliver his boots in retaliation for the incident that occurred on April 4, 2014. *Id.*

- On May 7, 2014, May 20, 2014, June 10, 2014 and June 26, 2014, Plaintiff wrote to Defendant Racette complaining that the staff refused to provide his boots and subsequently destroyed his property, in retaliation for his complaints against "security staff." *Id.* at pp. 64-67 & 71-72.

Because Plaintiff was confined in the IPC, he was compelled to give all mail to either an officer or an inmate/porter to mail. Pl.'s Dep. at p. 208. If he was on a "rec run" or a medical "call out," he was permitted to "drop his mail in the box." *Id.* at pp. 209-10. Placing a grievance in the designated mailbox is the equivalent of handing the grievance to an officer.[11] Pl.'s Sur-Reply at ¶¶ 10-11.

The record before the Court establishes that while Plaintiff's grievances were not

---

[11] Defendants did not provide any evidence to contradict Plaintiff's testimony regarding the submission process. Indeed, while Brousseau provided an affidavit detailing the grievance procedure at Clinton C.F., she did not address the submission process, as it pertained to inmates in IPC.

received, Gregory received Plaintiff's letters regarding the status of his grievances and responded to his inquiries.  Defendants did not provide an affidavit from Gregory or any evidence explaining why the letters to Gregory were received, but the grievances were not. Viewed in the light most favorable to Plaintiff, therefore, the evidence suggests that Plaintiff attempted to submit his grievances, but they were unfiled and unanswered. *Compare Medina v. Napoli*, 725 Fed. Appx. 51 (2d. Cir. 2008) (reversing district court award of summary judgment on exhaustion where the plaintiff's argument that defendants had taken actions to prevent the filing of his grievances was supported by admissible evidence) *with Hicks v. Adams*, 692 Fed. Appx. 647 (2d Cir. 2017) (granting summary judgment because the plaintiff's conclusory arguments were not supported by facts establishing "when he submitted the appeals, to whom, and what, if any steps, he took after the documents were not filed.").

Defendants argue that even if Plaintiff mailed the grievances and the correspondence was not filed or processed, Plaintiff was nonetheless obligated, under DOCCS regulations, to appeal and complete the grievance process when he did not receive a response. *See* Defs.' Mem. of Law at p. 12.  They further argue that Plaintiff has failed even to raise a question of fact as to whether the grievance procedure was effectively unavailable to him.  *Id.* Plaintiff, on the other hand, argues specifically that questions of fact do exist as to this point and offers several distinct grounds for finding that the grievance process was not available to him.  Pl.'s Supp. Resp. to Motion at ¶¶ 39-44.

In *Williams v. Priatno*, the plaintiff alleged that, while housed in the special housing unit, he drafted a grievance and delivered it to a correction officer to forward to the grievance office, but that he never received a response to his grievance and claimed that it was never filed by the correction officer.  829 F.3d 118, 120-121 (2d Cir. 2016).  The district court granted the defendants' motion to dismiss on non-exhaustion, holding that even if the plaintiff's grievance was never filed, he still could have appealed the grievance to the next level because the regulations allow an appeal in the absence of a response.  *Id.* at 121.  On appeal, the Second Circuit reversed, finding that the defendants' theory on which the district court relied imposed "time limitations and procedural hurdles that in all but the rarest of circumstances would preclude him from pursuing his unfiled and unanswered grievance, and that are, in any event, 'so confusing that . . . no reasonable prisoner can use them.'"  *Id.* at 125 (quoting *Ross v. Blake*, 136 S.Ct. at 1859).

Here, Plaintiff concedes that he knew how to file a grievance.  Pl.'s Dep. at pp. 205-211.  That "general knowledge" however, is "rendered useless if he was not properly informed how to proceed after not receiving a response."  *Reid v. Marzano*, 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 17, 2017).  Plaintiff testified that after attempting, on three occasions, to file a grievance, he deemed the process "unavailable" and began to write complaints to Defendant Racette.  Pl.'s Dep. at pp. 213 & 216-17.  Gregory, Annucci, and Defendant Racette received Plaintiff's inquiries regarding the status of his grievances, but did not provide Plaintiff with guidance on how to proceed when a grievance was unfiled and

unanswered. Indeed, Gregory's responses to Plaintiff's inquiries, which are identical in substance, did not clarify the process but, arguably, created confusion. *See Williams v. Prianto*, 829 F.3d at 125-26 (holding that providing instructions that apply to the filing of new complaints when a grievance is unfiled and unanswered, "only increase[s] confusion regarding the avenues available to pursue an appeal."). The record does not contain an affidavit from Gregory or Annucci and, while Defendant Racette provided a declaration, he does not dispute Plaintiff's claim that he was not advised how to proceed.  Without evidence contradicting Plaintiff's deposition testimony, which is supported by the letters and correspondence in the record, the Court accepts Plaintiff's claim that he did not know how to proceed in the light of responses to grievances he submitted, as true. *See Reid v. Marzano*, 2017 WL 1040420, at *3 (holding that the plaintiff's deposition testimony that he did not know how to proceed when he did not receive a response to his grievance was sufficient to withstand summary judgment on the issue of exhaustion).

"Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available." *Fann v. Graham*, 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018), *report and recommendation adopted*, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018).  Defendants thus have failed to carry their burden of proving the affirmative defense on the present record.  Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on the issue of non-exhaustion, as it relates to

Stickney, Devlin, Cross, Snow, and Brown be denied.  If this recommendation is accepted, the Court recommends that an exhaustion hearing be scheduled prior to any trial of this case.

### b. Claims Against Bullis

Whether Plaintiff exhausted his administrative remedies as to his First Amendment retaliation claim against Defendant Bullis requires a separate and distinct analysis.  In this regard, Plaintiff testified that he did not file, or attempt to file, a grievance complaining about Defendant Bullis' retaliatory actions because, in his view, complaints regarding retaliatory acts in a proceeding are "non-grievable."  Pl.'s Dep. at pp. 215-16.  Based upon Plaintiff's interpretation of DOCCS' regulations and procedures, inmates are required to raise retaliation claims related to disciplinary hearings during an appeal of the disciplinary process.  *Id*.  In that regard, Plaintiff appealed Defendant Bullis' decision.[12]  *Id; see also* Bullis Decl. at ¶ 9.

Plaintiff's understanding in this regard is simply mistaken.  Courts in this Circuit have held that "[t]hough a disciplinary appeal is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, 'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.'"  *Barker v. Smith*, 2017 WL 3701495, at *3 (S.D.N.Y. Aug. 25, 2017) (citations omitted).  "Where the inmate is asserting both retaliation claims and procedural due process claims, he must separately exhaust both

---

[12]  However, the record does not contain any evidence related to Plaintiff's IPC appeal, the sum and substance of the appeal, and whether Plaintiff made any reference to retaliation in the appeal.  Indeed, the only reference to retaliation against Defendant Bullis is contained in Plaintiff's pleadings and deposition.

types of claim, using the procedure appropriate to each type of claim." *Johnson v. Fraizer*, 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) (citations omitted).  Indeed, as here, "[a]n inmate claiming that a disciplinary procedure has been instituted or unfairly conducted as the result of retaliatory motives must [ ] follow the IGP three-step process rather than the disciplinary hearing appeal process in order to properly exhaust administrative remedies." *Mateo v. Gundrum*, 2013 WL 5454722, at *8 (N.D.N.Y. Sept. 30, 2013).

Here, the District Court has already dismissed Plaintiff's claims that the acts of Defendant Bullis in conducting the IPC hearing violated the Procedural Due Process Clause of the Fourteenth Amendment, both because there has been no showing of a protect liberty interest, and because Plaintiff never sufficiently pled that he was denied due process.  Dkt. No. 29 at pp. 17-22.  Therefore, the only claim that presently remains against Bullis is the separate and distinct claim that this Officer engaged in retaliatory conduct in violation of the First Amendment.  There has been no showing that Plaintiff even attempted to file a grievance as to that claim.  In sum, because Plaintiff fails to plausibly present questions of fact regarding his failure to exhaust his remedies related to a retaliation claim against Defendant Bullis, it is recommended that Defendants' Motion for Summary Judgment and dismissal of the retaliation claim against Defendant Bullis be granted on this ground.

## C.  Excessive Force and Failure to Intervene

### *1.  Legal Standard*

Under the Eighth Amendment's prohibition on "cruel and unusual punishment," "inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  In the context of an inmate's excessive force claim, the core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  To assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) an objective component focusing "on the harm done, in light of 'contemporary standards of decency,'" and (2) a subjective component showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. at 8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

As to Plaintiff's claim that certain correction officials did not step in to protect him, "[l]aw enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (S.D.N.Y. 2010) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d

501, 512 (S.D.N.Y. 2008)).   In order to establish liability for failure to prevent another officer from committing a constitutional violation a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene." *Id*.

## 2. *Analysis*

Plaintiff asserts excessive force and failure-to-intervene claims arising out of the April 4, 2014 incident.   *See* Pl.'s Supp. Resp. to Motion at pp. 2-6.   Plaintiff testified that Defendant Stickney escorted him to the interview room and, in Devlin's presence, "choked" Plaintiff, slammed him into a locker, and repeatedly punched, kicked, and "stomped" on him after he fell to the ground.   Pl.'s Dep. at pp. 70, 79, & 85-95.   Plaintiff alleges that during the attack, Defendant Stickney referred to Plaintiff's sexual assault complaint and yelled expletives.   *Id*. at pp. 88-89.   Plaintiff also alleges that he was smacked "really aggressively" by Defendant Cross.   *Id*. at p. 109.   Plaintiff also contends that he suffered a fractured rib as a result of the assault and that he repeatedly complained of pain during sick call.   Pl.'s Supp. Resp. to Motion at ¶¶ 20-25.

In response, Defendants argue that Plaintiff's recitation of the facts is not credible because: (1) he did not mention that he was assaulted during the examination by the nurse; (2) he did not sustain a rib fracture; and (3) the evidence supports nothing more than the use of *de minimis* force.   Defs.' Mem. of Law at pp. 18-19.   Defendants Stickney, Cross, and

*-25-*

Devlin assert, in conclusory fashion, that they did not "assault" Plaintiff and did not observe anyone else "assault" Plaintiff.  Stickney Decl. at ¶ 7; Cross Decl. at ¶ 6; Devlin Decl. at ¶ 9.  Additionally, Defendant Cross claims that he did not have any responsibilities on B Block during the evening of April 4, 2014.  Cross Decl. at ¶ 5.

Considering all of the evidence and the parties' materially different accounts of the incident, the Court is precluded from entering summary judgment.  Specifically, the parties' contentions create a disputed issue of material fact as to the subjective prong of the Eighth Amendment claim regarding whether Defendants applied force to Plaintiff "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. at 7.  A reasonable jury could credit Plaintiff's version of the facts.  The Court cannot appropriately resolve these credibility issues on a motion for summary judgment.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment."); *see also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 344-45 (S.D.N.Y. 2011) (denying inmate plaintiff's motion for summary judgment on excessive force claim where the defendant correctional officer claimed that the inmate attempted to strike him and the application of force was necessary).  The claim by Defendant Cross that he was not even present at the time of the assault, which claim is directly contradicted by the Plaintiff, is insufficient to entitle him to summary relief, even on the grounds of qualified immunity.  *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

Additionally, the Court is unpersuaded by Defendants' argument that, at best, Plaintiff suffered *de minimis* injuries and thus, any force applied was necessary. *See* Defs.' Mem. of Law at p. 17. Defendants' contention fails because while "[t]he extent of injury may . . . provide some indication of the amount of force applied . . . it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. at 37-38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7. Here, Defendant Stickney does not assert that he did not use force; rather, he claims that he did not "assault" Plaintiff. In contrast, Plaintiff alleges more than a *de minimis* application of force. Plaintiff's medical records establish that he made several complaints of rib pain and bruising to medical staff from April 16, 2014 until June 3, 2014. Exs. to Pl.'s Supp. Resp. at pp. 18-22. The medical records do not disclose injuries that are so minor that the Court can conclude that Defendants applied *de minimis* force.

Accordingly, for the foregoing reasons, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment claims against Defendants Stickney for excessive force, and against Defendant Devlin and Cross for failure to intervene, be denied. However, this Court does recommend that the Eighth Amendment Claims against "John Does" be dismissed without prejudice. Plaintiff has never identified the John Does during the course of discovery, as he was directed to do by the District Court. Dkt. No. 29 at p. 25, n. 9 ("If plaintiff fails to ascertain the identity of any defendant so as to permit the timely service of process, all claims against that individual will be dismissed."). *See Burns*

*v. Trombly*, 624 F. Supp. 2d 185, 197-98 (N.D.N.Y. 2008) (collecting cases) (dismissing claims against John Doe Defendants where after two years of litigation, the *pro se* plaintiff failed to identify the John Doe defendants).

### D. Retaliation

#### 1. Legal Standard

"[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d at 493).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). The

plaintiff bears the initial burden in showing "that the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d at 79. As to the second prong, if the conduct would not "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

To satisfy the causal connection prong, a prisoner must present evidence that allows an inference that a defendant acted with an improper motive. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994)); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (stating that a defendant may successfully meet this burden by demonstrating that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report") (internal quotations marks omitted).

"Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 473 (N.D.N.Y. 2009) (citing *Graham v. Henderson*, 89 F.3d at 79).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

### 2. Analysis

#### a. Retaliation Claims Against Stickney, Devlin, and Cross

The basis of Plaintiff's retaliation claims against Defendants Stickney, Devlin, and Cross is that Defendants violated his Eighth Amendment rights in retaliation for complaining about sexual harassment, abuse, and aggressive pat frisks. Pl.'s Supp. Resp. to Motion at ¶ 8. Defendants argue that Plaintiff did not engage in protected activity because he did not file grievances against these defendants. Defs.' Mem. of Law at p. 19.[13] Notably lacking from Defendants' Motion is any argument that Plaintiff's verbal complaints to Defendant Devlin

---

[13] Defendants also suggest that Plaintiff's deposition testimony suggests that the retaliation was motivated by Plaintiff's prior assaults on staff, which they contend is not protected activity. Defs.' Mem. of Law at pp. 19-20. As noted below, however, Plaintiff contends that the motivation behind the alleged assault against him was more than just this prior conduct. Indeed, his deposition reveals more than one possible alleged motive.

do not constitute protected speech.

"Courts in this Circuit have held that an inmate's verbal complaints to corrections officers and prison officials may constitute activity protected by the First Amendment. *Guillory v. Haywood*, 2015 WL 268933, at *18 (N.D.N.Y. Jan. 21, 2015) (collecting cases); *see also Tirado v. Shutt*, 2015 WL 774982, at *9 (S.D.N.Y. Feb. 23, 2015), *report and recommendation adopted in part*, 2015 WL 4476027 (S.D.N.Y. July 22, 2015) (citing *Lunney v. Brureton*, 2007 WL 1544629 at *24 & n. 10 (S.D.N.Y. May 29, 2007) (holding that defendant correction officers were not entitled to summary judgment on retaliation claim where inmate alleged they assaulted him after he made an oral complaint), *report and recommendation adopted*, 2007 WL 2050301 at *1 (S.D.N.Y. July 17, 2007)).  During his deposition, Plaintiff testified that he stated, in the presence of Defendants Stickney, Devlin, and Cross, "I'm being violated.  I just credit-carded [sic], and you ain't doing nothing about it, man.  Why are they violating me like that?"  Pl.'s Dep. at pp. 78 & 106.  Plaintiff claims that Defendants Stickney and Cross specifically referenced his complaints prior to assaulting him.  Pl.'s Dep. at pp. 88-89 & 103-109.  Defendants have not presented any evidence contradicting Plaintiff's testimony.  Based upon the conflicting accounts of the events in and around the interview room, the Court finds genuine issues of fact exist as to whether Plaintiff engaged in protected conduct.

Defendants do not present any argument with respect to the remaining elements of the retaliation claim.  The Court, however, notes that a physical assault may constitute an adverse

action under the First Amendment, even without rising to the level of an Eighth Amendment excessive force violation. *See Flemming v. King*, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis."). With respect to causation, Plaintiff claims that upon arriving in the interview room, he complained of being sexually assaulted, and was immediately attacked by Defendant Stickney. Plaintiff also maintains that Defendant Stickney repeatedly referred to Plaintiff's complaints during the alleged assault. Pl.'s Dep. at pp. 76-78 & 88-89.

Based upon the record before the Court, it is recommended that Defendants' Motion for Summary Judgment and dismissal of Plaintiff's retaliation claims against Stickney, Devlin, and Cross be denied.

### b. Retaliation Claims Against Snow

Plaintiff testified that Defendant Snow was motivated to retaliate against Plaintiff because Plaintiff complained that he was assaulted by security staff. Pl.'s Dep. at pp. 153-54. Defendants argue that Plaintiff's speculation that Snow "might have been motivated to retaliate" because he worked in the same prison as staff members he complained about is insufficient to support a retaliation claim. Defs.' Mem. of Law at p. 20. Moreover, Defendant Snow contends that he would have issued the IPC recommendation absent any retaliatory motive. *See* Snow Decl. at ¶¶ 12-17.

Even assuming Plaintiff established that he engaged in protected conduct and suffered an adverse action, Plaintiff has failed to establish a causal connection between his complaints and Snow's IPC recommendation. "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Here, Plaintiff did not file any grievances or complaints against Defendant Snow prior to April 7, 2014. Pl.'s Dep. at p. 154. In fact, Plaintiff testified that he never encountered Defendant Snow prior to April 2014. *Id*. Although Plaintiff's unsupported allegations that Defendant Snow retaliated against him by recommending IPC may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment. Additionally, Defendants have established, in view of Plaintiff's admission that he would not identify the individuals involved in the incident, that even absent any potential retaliatory motivation, Defendant Snow would have issued the IPC recommendation. *See* Pl.'s Dep. at p. 132. Accordingly, I recommend that Defendants' Motion for Summary Judgment be granted and Plaintiff's retaliation claim against Snow be dismissed.

### c. *Retaliation Claims Against Bullis*[14]

Plaintiff also contends that Defendant Bullis' IPC determination was made in retaliation for his complaints. As with Defendant Snow, however, Plaintiff fails to establish

---

[14] Although the Court recommends dismissal of this claim on exhaustion grounds, I address here the merits of this claim in the interest of completeness.

a causal connection between his complaints and Defendant Bullis' actions. Plaintiff does not contend that Bullis retaliated against him because he had filed any previous grievance or complaint against him. Instead, Plaintiff testified only that Defendant Bullis retaliated against him because he works with the individuals Plaintiff had complained about. Pl.'s Dep. at pp. 163-165. As such, as with Defendant Snow, Plaintiff's unsupported allegation is insufficient to establish "one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4.

### d. Retaliation Claims Against Brown

Plaintiff claims that Defendant Brown destroyed his boots in retaliation for Plaintiff's complaints of sexual abuse. Pl.'s Supp. Resp. to Motion at ¶ 29. Upon review, the Court concludes that Plaintiff has not supplied sufficient evidence to oppose Defendant Brown's Motion on this claim, and recommends that the Motion be granted.

Initially, the Court disagrees with Defendant Brown's assertion that Plaintiff did not engage in protected conduct because he never filed a complaint or grievance related to the boots. Defs.' Mem. of Law at p. 20. On May 2, 2014, Defendant Brown forwarded a letter to the Inspector General's Office. Exs. to Pl.'s Supp. Resp. at p. 38. The correspondence referenced a PREA complaint number, Plaintiff's name, and Plaintiff's DIN. *Id*. A PREA complaint is protected speech. *See Mays v. Santos*, 2018 WL 1407202, at *10 (S.D. Ill. Mar. 21, 2018) ("Plaintiff's PREA complaint was activity protected by the First Amendment."). In this instance, the correspondence from Defendant Brown suggests that he was aware that

Plaintiff engaged in protected conduct.

With respect to the second element of a retaliation claim, Plaintiff alleges that he suffered an adverse action because Defendant Brown intentionally destroyed his personal property. The Court generally agrees with the merits of this argument. "The retaliatory destruction of an inmate's personal property can constitute an adverse action." *Roseboro v. Gillespie*, 791 F. Supp. 2d at 374 (citations omitted); *Mateo v. Bristow*, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013).

The point where this retaliation claim fails, however, is on the issue of causation and improper motive. To summarize, the replacement boots from Timberland arrived at the facility on or before April 11, 2018, and were not delivered to Plaintiff because they contained metal in the heels. Dkt. No. 86-12 at p. 18. Defendants contend that DOCCS' policy did not permit Plaintiff to possess boots with metal shanks. Defs.' Mem. of Law at p. 20. This regulation does not appear to be in dispute, and has been previously accepted by the Courts. *Walker v. Fischer*, 523 Fed. Appx. 43, 44 (2d Cir. 2013) ("Clinton's security personnel reasonably concluded that permitting Walker to have the boots inside his cell posed a significant security threat because the boots contained metal or hard plastic, which Walker could use to fashion a weapon."). Plaintiff was clearly under the misapprehension that the replacement boots from Timberland were identical to his old boots, which contained no metal, and therefore he could not comprehend why the boots were being denied. In the absence of a legitimate reason, Plaintiff concluded that the denial of the boots was retaliatory

in nature, and filed a complaint with Superintendent Racette on April 29, 2014.  Brown

Decl., Ex. A at pp. 15-16.  In truth, however, the disparity between how the two sets of boots

were handled was a direct result of the physical attributes of the boots themselves.

Superintendent Racette assigned the matter to Defendant Brown to investigate, and

he, in turn, referred it to Sergeant McCasland.  Brown Decl. at ¶¶ 9-10.  According to his

May 8, 2015 Memorandum, Sergeant McCasland confirmed that the X-rays of the boots

disclosed that they had metal shanks inside the soles which would need to be removed prior

to acceptance by the Facility, and that he had explained this fact to inmate Daum, who did

not accept this explanation and refused to fill out the Form 2068 necessary to send the boots

home or elsewhere.  Brown Decl. at ¶ 10, Ex. A at p. 12; Pl.'s Dep. at p. 181 ("I'm like, Yo,

listen, you know, I'm not signing nothing.  It's not happening.  I want my boots.").  Sergeant

McCasland himself filled out the necessary form, and noted that under the policy the boots

would be destroyed on May 10, 2014, thirty days after receipt.  Brown Decl. at ¶ 10, Ex. A

at p. 17.  Defendant Brown signed the authorization for disposal of personal property on May

8, 2014.  *Id.*  On May 20, 2014, Plaintiff wrote to the Superintendent again, acknowledging

that the Sergeant had spoken to him, but still insisting that the boots did not have a metal

shank in the heel.  *Id.* at p. 11.  On June 4, 2014, Plaintiff wrote to Deputy Brown, finally

acknowledging that the boots Timberland sent were not what he thought, and inquiring as

to whether he could send the boots home.  *Id.* at p. 6.  At that point, however, approximately

sixty days had elapsed from the initial receipt of the boots, and therefore they had already

been destroyed in accordance with the prison directives. *Id.* at p. 5

"[P]rison officials have broad administrative and discretionary authority over the institutions they manage." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (internal quotation marks and citation omitted). What is more, a "district court should recognize that the presumption of proper purpose accorded the acts of prison officials is particularly strong when officials act pursuant to a duty imposed by a prison regulation which is observed in practice and is essential to prison discipline and order." *Rivera v. Senkowski*, 62 F.3d 80, 86 (2d Cir. 1995). Applying this guidance, it is the Court's opinion that Defendant Brown's Motion for Summary Judgment regarding the destruction of the boots should be granted.

Initially, with the understanding that the boots themselves violated prison regulations, any claim that the enforcement of those regulations by Defendant against Plaintiff was retaliatory in nature is wholly speculative. Second, even if there could be a colorable claim of retaliation, there is an independent basis for the destruction of the non-conforming property. In other words, even if this were a dual motivation case, the existence of a valid institutional policy coupled with the undisputed fact that the boots fell under that policy and that Plaintiff refused to designate someone else to receive the boots within the time period set forth by the policy, satisfies Defendant's burden. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.'") (quoting *Lowrance*

*v. Achtyl*, 20 F.3d at 535).

Finally, even if one were to presume the First Amendment claim could survive this Motion, Defendant Brown would nevertheless be entitled to qualified immunity. His conduct in directing a separate official to investigate the matter; having that official confirm that the boots in question were nonconforming because they contained metal shanks; and authorizing the destruction of the property upon being advised that the inmate was refusing to have the boots sent out to someone outside the facility, was objectively reasonable conduct that did not violate clearly established law.

### E. Claims Against Defendant Racette

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). A supervisory official "may not be held liable for damages merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright* v. Smith, 21 F.3d at 501) (further citations omitted). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)

(quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (stating that the defendant may not be held liable simply because he holds a high position of authority).

The Second Circuit has held that the personal involvement of a supervisory official may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d at 873 (citations omitted).[15]

Here, Plaintiff does not claim that Defendant Racette was personally involved in any alleged constitutional deprivation. Plaintiff's supervisory claims against Defendant Racette are based upon the second *Colon* factor - his alleged failure to reasonably investigate a

---

[15]  The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp*., 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 F. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role. *See, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

constitutional violation and remedy the wrong.

The relevant evidence is as follows:

- On April 22, 2014, Defendant Racette received a letter from Cynthia Conti-Cook, an attorney, advising that Plaintiff was assaulted by officers on April 4, 2014. Racette Decl. at ¶ 8, Ex. A. at p. 1. Defendant Racette responded advising that he could not release information without Plaintiff's consent. *Id.* at ¶ 9, Ex. B.

- On April 21, 2014, Defendant Racette received an email from Defendant Bullis advising that Plaintiff claimed he was assaulted by staff. *Id.* at ¶ 10, Ex. C.

- On April 29, 2014 and May 21, 2014, Defendant Racette received letters from Plaintiff claiming that he was being denied his boots in retaliation for his complaints. Racette Decl. at ¶ 12; Exs. to Pl.'s Supp. Resp. at pp. 60-61 & 68.

### 1. Claims Related to April 4, 2014 Incident

"Whether a supervisory official can be liable under the second *Colon* factor - failing to remedy a wrong after learning of the violation - appears to turn on whether the complaint alleges an 'ongoing' constitutional violation." *Guillory v. Weber*, 2015 WL 1419088, at *11 (N.D.N.Y. Mar. 27, 2015) (citation omitted). "If the violation has already occurred and is not ongoing, then 'the official will not be found personally responsible for failing to remedy a violation.'" *Id.* (citation omitted).

With respect to the April 4, 2014 incident, the letters and emails do not contain complaints related to ongoing violations; rather, the complaints involve a single alleged incident of excessive force. Under the aforementioned standards, because the alleged

violation was not ongoing, Defendant Racette was not personally involved in any constitutional violation arising from that incident. *See Martin v. Patterson*, 2010 WL 3033796, at *3 (N.D.N.Y. July 16, 2010), *report and recommendation adopted*, 2010 WL 3033809 (N.D.N.Y. Aug. 3, 2010) (dismissing supervisory claims for failure to allege personal involvement of supervisory defendant "based upon his failure to 'remedy the wrong' and based on a single incident of alleged excessive force.").

## 2. Claims Related to Boots

With respect to Plaintiff's retaliation claim related to his boots, while Plaintiff alleges that he sent letters regarding his boots to Defendant Racette, it is undisputed that Defendant Racette did not personally investigate the complaints lodged in those letters, but instead referred the investigation to Defendant Brown. The mere receipt of, without personally investigating, a letter from an inmate is insufficient to establish personal involvement. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (citing cases). "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see also Vega v. Artus*, 610 F. Supp. 2d 195, 199 (N.D.N.Y. 2009). Defendant Racette received letters from Plaintiff, which he forwarded to Defendant Brown to investigate and answer. Racette Decl. at ¶¶ 12 & 13; Exs. to Pl.'s Supp. Resp. at pp. 62 & 68. Accordingly, Plaintiff's letters to Defendant Racette are insufficient to establish

Defendant Racette's personal involvement.   Therefore, the Court recommends granting Defendants' Motion for Summary Judgment and dismissal of Plaintiff's claims against Defendant Racette.

## F.  Qualified Immunity

Defendants also argue that they are entitled to qualified immunity from Plaintiff's Eighth Amendment and First Amendment claims.   Defs.' Mem. of Law at pp. 23-24.   The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified immunity analysis involves a three step inquiry:

> First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then, we must consider if the violated right was clearly established at the time of the conduct. Finally, if plaintiff had a clearly established, constitutionally protected right that was violated ..., he or she must demonstrate that defendants' actions were not objectively reasonable.

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003) (citations omitted).   "[W]hether an official protected by qualified immunity may be held [] liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken."   *Lewis v. Cowen*, 165 F.3d 154, 166 (2d Cir. 1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).   By 2014, the date of the events alleged in the Amended Complaint, a prisoner's rights to be free from excessive force or retaliation were

clearly established.  *See Allen v. City of New York*, 480 F. Supp. 2d 689, 710 (S.D.N.Y. 2007); *Vincent v. Sitnewski*, 117 F. Supp. 3d 329, 342 (S.D.N.Y. 2015) ("Retaliation claims have long been a fixture of First Amendment law.").  Except as to Defendant Brown, as detailed *supra*, there are significant questions of fact that prevent the Court from determining as a matter of law that it would have been objectively reasonable for Defendants to believe that they were not violating Plaintiff's rights.  Accordingly, the Court recommends that as to Defendants Stickney, Devlin and Cross, their Motion for Summary Judgment on the grounds of qualified immunity be denied.

## IV.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 86) be **GRANTED** as to Plaintiff's claims against Defendants Bullis, Snow, Brown, and Racette; and **DENIED** in all other respects; and it is further

**RECOMMENDED**, that all claims against the "John Doe" Defendants be dismissed without prejudice; and it is further

**RECOMMENDED**, that if the Court's recommendations are accepted an exhaustion hearing should be scheduled prior to such trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which

to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: November 5, 2018
        Albany, New York


Daniel J. Stewart
U.S. Magistrate Judge

*-44-*