**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TERRY DAUM,

                              Plaintiff,

            - v -                                              9:15-CV-1083
                                                              (DNH/DJS)
DEVLIN, *et al.*,

                              Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

SAUNDERS KAHLER L.L.P.                    MICHAEL D. CALLAN, ESQ.[1]
Attorney for Plaintiff
185 Genesee Street
Suite 1400
Utica, New York 13501-2194

HON. LETITIA JAMES                       MARK G. MITCHELL, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants
The Capital
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION AND ORDER

## I.  INTRODUCTION

        This matter is presently before the Court for a decision after an exhaustion hearing

which was held on September 5, 2019.  *See Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011).

For the reasons that follow, the Court finds that the Defendants have not sustained their

_____

[1]*Pro bono* counsel was appointed for trial on March 25, 2019.  Dkt. No. 103.

burden of proof on the affirmative defense of failure to exhaust.

## II. PROCEDURAL HISTORY

On September 4, 2015, *pro se* Plaintiff Terry Daum commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  Dkt. No. 1, Compl.  A complete factual summary was provided in this Court's November 5, 2018 Report-Recommendation and Order ("R & R"), and will not be repeated in detail here except as follows:

In sum, Plaintiff alleges that on April 3, 2014, an incident occurred in the North Yard at the Clinton Correctional Facility, triggering heightened security at the facility, as a result of which Plaintiff maintains he was subjected to an improper and sexually abusive pat frisk by Defendant Chad Stickney.  Compl.; R & R at p. 2.  Plaintiff alleges that he reported this incident to his brother, who called the facility on April 4, 2014, to register a complaint.  *Id.* at pp. 2-3.  Later in the evening of April 4, Plaintiff alleges he was called downstairs to an area known as "the flats" where he was further assaulted by Corrections Officer Stickney, who again is said to have performed an improper search, including a "credit card swipe" which involves using "full hands [] up [his] rectum aggressively."  *Id.* at p. 3.  He was then brought before Capt. Devlin where, after an unfruitful dialogue, he was repeatedly punched, kicked, and knocked to the ground by Corrections Officer Stickney, while Captain Devlin and Defendant Cross looked on and failed to intervene.   *Id.* at pp. 3-4.  Defendant Cross is said to have struck Plaintiff and told him to stop filing complaints. *Id.* at p. 4.  Plaintiff was

then brought down to his cell by Defendant Stickney and other unidentified Officers, and was pinned face down on his mattress and punched in the back. *Id.*

After reviewing the evidence, including deposition testimony, this Court concluded that there were sufficient questions of fact that required a trial on three separate claims: (1) an Eighth Amendment excessive force claim against Defendant Stickney; (2) an Eighth Amendment failure to protect claim against Defendants Devlin and Cross; and (3) a First Amendment retaliation claim against Defendants Stickney, Devlin, and Cross. R & R at p. 43. That Recommendation was then adopted by the District Court. Dkt. No. 100.

As part of their Answers, Defendants raised the affirmative defense that Plaintiff failed to exhaust his administrative remedies. Dkt. No. 15 at ¶ 8; Dkt. No. 37 at ¶ 16. In order to expeditiously address this potentially dispositive issue, the Court directed that an exhaustion hearing be held and that Plaintiff be appointed counsel. Dkt. Nos. 103 & 105. On September 5, 2019, the exhaustion hearing was held. Rachel Seguin, Christine Gregory, and Gregory King testified on behalf of Defendants. They provided testimony regarding DOCCS grievance procedures and Plaintiff's grievance history. Plaintiff Terry Daum testified on his own behalf. The Court also heard the telephone testimony of Gary Bowen, an inmate in DOCCS custody, who was formerly incarcerated at Clinton C.F. Numerous Exhibits were introduced. The parties then submitted post-hearing briefing on September 19, 2019. Dkt. Nos. 122 & 123.

## III. DISCUSSION

### A. DOCCS Grievance Procedure

In New York, DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams v. Correction Officer Priatno*, 829 F.3d 118, 119 (2d Cir. 2016). The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1 & 701.5; *Williams v. Correction Officer Priatno*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). Representatives of the inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2). A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7

N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

As can be seen, at each step of the IGP, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5.[2] Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA.[3] *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).") (internal quotation marks omitted).

## B. Legal Background

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility

---

[2] Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(g). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

[3] In situations where the inmate's complaint concerns sexual abuse, sexual harassment, sexual threats, or staff voyeurism, the policy of DOCCS is that the inmate can make a report of this conduct to certain identified officials, and if the inmate does so, the claim shall be deemed exhausted. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3; DOCCS Directive # 4028A. This policy is premised upon the Prison Rape Elimination Act of 2003 (PREA) as well as DOCCS' well-founded position that they have zero tolerance for sexual abuse and sexual harassment of inmates. *Sheffer v. Fleury*, 2019 WL 3891143, at *3 (N.D.N.Y. Aug. 19, 2019), *report and recommendation adopted*, 2019 WL 4463672 (N.D.N.Y. Sept. 18, 2019). This policy, however, does not apply to physical searches of inmates that are conducted in accordance with a separate directive, # 4910. Plaintiff's counsel has not argued that Directive # 4028A applies to the present case, and in light of the Court's ultimate decision, it is not necessary to reach this issue.

until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id*. at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "The exhaustion inquiry thus requires [a court to] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009).

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if those remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison

administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

The Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d at 308-10. The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were available to the plaintiff and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Id.*

## C. The Exhaustion Hearing

As noted above, the exhaustion hearing was held on September 5, 2019. During that hearing, documentary evidence was produced. The Exhibits that were received into evidence were as follows:

Exhibit D-1:  CORC Search Printout
Exhibit D-2:  DOCCS Directive 4040
Exhibit D-3:  7 N.Y.C.R.R. §§ 701.5, 701.6, & 701.8
Exhibit D-4:  Clinton Correctional Facility Grievance Summary
Exhibit D-5:  Correspondence Between Christine Gregory and Plaintiff

Exhibit D-6:  Plaintiff's Inmate Movement and Disciplinary History (redacted)
Exhibit P-11: April 19, 2014 Letter from Daum to the Inmate Grievance Clerk
Exhibit P-12: April 21, 2014 Grievance Letter from Daum to IGP Supervisor C. Gregory
Exhibit P-16: April 29, 2014 Letter from Daum to Superintendent Racette
Exhibit P-17: May 2, 2014 Memorandum from Superintendent Racette to Daum
Exhibit P-19: May 20, 2014 Follow-Up Letter  from Daum to Superintendent Racette
Exhibit P-20: May 23, 2014 Memorandum from Superintendent Racette to Daum
Exhibit P-23: Letter from Daum to the DOCCS Commissioner's Office

In addition, several witnesses were called to the stand.  The first was Rachel Seguin, Assistant Director of the Inmate Grievance Program, who works at the Central Office Review Committee, which is commonly known as "CORC."  She explained the three-step grievance procedure that applies to inmates housed in DOCCS facilities, as outlined above. She noted that the Clinton Correctional Facility had a functioning grievance process in place at the relevant time.  Ms. Seguin then testified that she reviewed a computer printout of all Terry Daum's appeals to CORC (Exhibit D-1), and that there was no record of any appeal concerning excessive use of force, retaliation, or failure to intervene arising out of an incident at the Clinton Correctional Facility in April 2014.  Ms. Seguin noted that Mr. Daum had filed over forty appeals with CORC prior to April 2014, and therefore was quite familiar with the process.

On cross-examination, Ms. Seguin conceded that DOCCS policy does not address how an inmate would move forward in the grievance process if his initial grievance was not accepted or filed at all.

Next, Christine Gregory was questioned.  She is the Inmate Grievance Program Supervisor at the Clinton Correctional Facility, and is a 23 year veteran of DOCCS.  In her

position she keeps track of all grievances filed at the Clinton Correctional Facility. She explained that if an inmate files a grievance, it is reviewed by her office and coded, filed, and investigated. If the grievance presents an issue of staff misconduct, the grievance goes directly to the Superintendent. If it presents a non-staff conduct issue, it goes to the IGRC. She also explained the appeal process, as previously set forth by Ms. Seguin. Ms. Gregrory made reference to Exhibit D-4, which is a printout of grievances filed by Inmate Daum. According to that record, Terry Daum did not file a grievance at any time during the month of April 2014.

Ms. Gregory indicated that Mr. Daum did send a letter to her on April 17, 2014 inquiring about the status of a grievance, but she had no such grievance. She responded to Mr. Daum on April 18, indicating that there was no grievance on file, and that he should resubmit any grievance. She indicated she then received a second letter from Mr. Daum on April 23 inquiring about the second grievance that he filed. Once again she had no record of any grievance, and she wrote back to him on April 28 explaining that and inviting him to submit a new grievance. Supervisor Gregory also noted that in the event that the time period to file a grievance may have passed, he could apply for an extension. She testified that she had no animosity towards Mr. Daum; that she never received a grievance from him in April 2014, and that she certainly never destroyed any such grievance. Mr. Daum was then transferred out of Clinton Correctional Facility on July 8, 2014.

Upon questioning by Mr. Daum's attorney, Ms. Gregory conceded that no instruction was provided to the inmates as to how to proceed or appeal in situations where an initial

grievance was never acknowledged or accepted. As she explained to the Court, a grievance has to be coded in order to be considered or appealed. She does not work on a block where the inmates are housed, and she does not pick up grievances that are filed on the block. Rather, that mail goes to another person, is sorted, and ultimately arrives at her office. She acknowledged she did not tell Mr. Daum what to do if his grievances were not being filed, processed, or responded to. She did not, and in the regular course would not, send anyone to the block to investigate the situation reported by Mr. Daum.

Sgt. Gregory King was then called by Defendants and testified that he was employed at Clinton Correctional Facility during the relevant time and worked on E Block. He noted that the inmates in the Block, even those in protective custody, have all the supplies necessary to fill out a grievance. He testified that inmates oftentimes do give their mail to inmate porters to be delivered. He was not aware of anyone not delivering E Block mail. Upon cross examination, he noted that grievance mail is picked up once per day. It goes to the correspondence office where it is sorted with the other mail, some of which goes to the post office, but grievances are sent to the area controlled by Supervisor Gregory.

The Court then arranged for the testimony, by telephone, of inmate Gary Bowen, who is presently housed at Attica Correctional Facility but at the time relevant to this case was a Porter on E Block at the Clinton Correctional Facility. He testified that he remembered Terry Daum when he was brought to restricted housing, and that he was told by a Corrections Sergeant on the Block not to assist or to mail anything for Mr. Daum. Nevertheless, Mr. Bowen testified that he picked up mail from Plaintiff and in fact mailed it.

Finally, Terry Daum testified.  He confirmed that the incident which he wished to grieve occurred on April 4, 2014, and that he sought medical attention on April 8, 2014.  He prepared his first grievance which was mailed on April 10, 2014.  When he did not receive an acknowledgment of the grievance, he wrote to Supervisor Gregory, who wrote back indicating that she had no such grievance.  Exhibit D-5.  Mr. Daum did not retain a copy of the original grievance to provide to the Court.  However, he submitted a new grievance regarding the same conduct on April 21, 2014, and provided that to inmate Bowen to mail.  Exhibit P-12.  A copy of that grievance was provided the Court.  *Id.*  That grievance alleged that Plaintiff was improperly and sexually touched during a pat-down frisk on April 4, 2014; that he notified his family who then reported the incident by way of a complaint to the Facility; that after the call from family, Plaintiff was called "downstairs" by correctional staff, improperly pat-frisked again, brought before a Captain, physically assaulted, and then returned to his cell where he was assaulted again.  *Id.*  Still not hearing anything after mailing the second grievance, Mr. Daum wrote a letter of inquiry to Ms. Gregory on April 23.  Exhibit D-5.  He received a response back from Ms. Gregory on April 28 indicating that, once again, no grievance was on file in her office.  *Id.*  Plaintiff then wrote to various officials, including the Superintendent of the Facility, the Commissioner, and CORC.  Exhibits P-16 & P-23.  Mr. Daum conceded that he did not file an appeal at any time.  He asserted, however, that under the regulations there was nothing to appeal because, without the grievance being filed, the grievance process had not even commenced.

### D. Determination

A limited question is presented to be determined.  Plaintiff concedes that he did not

fully exhaust the inmate grievance process.  Rather, he maintains that the IGP was effectively

unavailable to him because he tried to file two grievances which were either not received or

not processed.  The parties have filed post-hearing briefs on this limited issue.  Plaintiff's

counsel asserts that the credible evidence established that Plaintiff reached a dead end in the

grievance process due to the failure of the facility to even accept his grievance once he

mailed it, or caused it to be mailed.  Dkt. No. 122.  Counsel for the Defendants, on the other

hand, argues first that Plaintiff has not established that he, in fact, attempted to grieve the

incidents in question.  Counsel  notes that other mail from Mr. Daum to the Superintendent

of the Facility on this issue reached its destination, belying Plaintiff's claims that his

grievances were somehow interfered with.  Dkt. No. 123 at p. 3.  Defendants also contend

that it is Plaintiff's burden to establish that the grievance process was unavailable and that

Mr. Daum has simply failed to do so.  *Id.* at pp. 4-6.  Defendants maintain that even in a

situation where an inmate mails a grievance and does not receive a response, the inmate is

nevertheless required to appeal his grievance all the way to CORC and that Plaintiff, by

failing to do so, did not exhaust his remedies.  *Id.* at pp. 4-5.  Finally, as an alternative

argument, Defendants assert that Plaintiff's First Amendment retaliation claim was not part

of any purported grievance, and therefore this claim should be dismissed as unexhausted.

*Id.* at p. 6.

Based on the evidence adduced at the hearing, the Court recommends that Defendants'

arguments be rejected and that the Court conclude that on the particular facts of this case the inmate grievance program was unavailable to Plaintiff and that the matter proceed to trial.

As to credibility, all of the witnesses who testified at the hearing appeared to be testifying to the best of their knowledge. The Court recognizes that Mr. Daum has a significant criminal history, but his testimony on the grievance issue was both credible and supported by relevant documentation. He has always maintained a consistent recall of the events surrounding his multiple efforts to grieve. It is significant to the Court that Plaintiff was inquiring regarding the status of his grievances while the time frame to file such a grievance had not yet even expired, corroborating his allegations that he filed the grievances. Plaintiff filed a second grievance on April 21 or April 22, and provided a copy of that grievance to the Court. He followed up with contemporaneous letters to officials noting his grievances were not filed, as acknowledged by DOCCS witness Christine Gregory at the hearing. I find his version of events compelling. *Compare Coleman v. Nolan,* 2018 WL 4732778, at *6 (N.D.N.Y. Oct. 2, 2018) (finding plaintiff credible where he submitted two grievances through staff at the Clinton Correctional Facility, submitted FOIL requests concerning the status of the grievances, and wrote to the Superintendent and the New York State Attorney General's Office regarding the failure of the process) *with Armand v. Mosko*, 2019 WL 2374948, at *4 (W.D.N.Y. Apr. 9, 2019), *report and recommendation adopted*, 2019 WL 2374001 (W.D.N.Y. June 4, 2019) (rejecting plaintiff's claim that grievances were handed to corrections officers at Five Points SHU who failed to forward them, when plaintiff had previously indicated that no grievances had been filed because she feared retaliation, or

alternatively, that she could not prepare a grievances because of injuries).

While I also find Ms. Gregory's testimony credible that she did not receive the two grievances, and certainly did not destroy or intentionally refuse to file them, that does not end the inquiry. This is so, even though at one point Plaintiff himself surmised that it was Ms. Gregory who refused to log his grievances. The testimony before the Court was that the grievances would go through other people's hands before they got to her office. For whatever reason, those grievances did not end up where they should have. It is not Plaintiff's burden to establish exactly how this failure occurred. *Coleman v. Nolan*, 2018 WL 4732778, at *9 ("[T]here is no way plaintiff could know how his grievances disappeared, because inmates at Clinton were not in a position to monitor what happened during mail pick-up, sorting, or delivery.").

There is no dispute that the grievances at issue were never filed. The question then becomes what, if any, remedy Plaintiff had under the circumstances. Central to this Court's analysis of that question is Chief Judge Katzmann's decision in *Williams,* in which the Second Circuit considered whether administrative remedies had actually been "available" to an inmate, applying the "unavailability" inquiry outlined in *Ros*s. *Williams v. Corrections Officer Priatno,* 829 F.3d at 123. In *Williams*, the plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a corrections officer to forward to the grievance office on his behalf. *Id*. at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id*. at 121. He never received a response to his grievance and he alleged that it was never filed by the corrections officer to

whom he had given it. *Id*. It was undisputed that he never appealed the grievance. *Id*.

The defendants argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed . . . [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* held that "the process to appeal an *unfiled and unanswered* grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126 (emphasis added); *see also Berman v. Durkin*, 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

On its face this case is similar to *Williams*. Plaintiff has made a sufficient showing that he attempted to submit timely grievances. Those grievances were, for whatever reason, never filed and responded to at the facility level. The record testimony is that inmates at Clinton Correctional Facility were not instructed what to do in such a circumstance and that a grievance that had not been officially coded could not be appealed. Gregory Testimony at

pp. 30 & 33-34.[4]  Here, then, Defendants' suggestion that Plaintiff should have nonetheless filed an appeal runs counter to the Second Circuit's clear statement in *Williams*, made under similar circumstances,[5] that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.  In the Court's view that holding controls this case.

Defendants instead urge the Court to rely on the Second Circuit's unpublished summary order in *Cicio v. Wenderlich* to find that even though Plaintiff received no response to his grievances he could and should have appealed them through the normal CORC process.  Dkt. No. 123 at pp. 4-5; *Cicio v. Wenderlich*, 714 Fed. Appx. 96, 97-98 (2d Cir. 2018) (summary order) (characterizing grievance program regulations affording inmates a right to appeal when they receive no response as providing "a clear avenue to proceed").[6]  On the factual record in this case, however, Defendants' reliance on *Cicio* is misplaced.  Here, the record demonstrates that Plaintiff did not have such a "clear avenue."  It appears that inmates were provided no instruction at Clinton C.F. on how to proceed in the wake of filing a grievance and receiving no response.  Gregory Testimony at p. 30.  Moreover, Ms. Gregory specifically testified that no appeal could be taken from a grievance that had not

---

[4] The Court requested a copy of Ms. Gregory's hearing testimony from the Court stenographer.  It is annexed to this Report-Recommendation as an Appendix and cited herein as "Gregory Testimony" followed by the page number.

[5] *Williams* did involve one fact not present here, a quick transfer of the plaintiff from one facility to another, while the grievance process was underway.  *Williams v. Corrections Officer Priatno*, 829 F.3d at 121.  The transfer was not a determinative factor in *Williams*, however, as the Court noted that it merely "compounded" the problem of grievance procedure regulations that were "already 'so confusing' that 'no ordinary prisoner can discern or navigate them.'" *Id.* at 126 (quoting *Ross v. Blake*, 136 S. Ct. 1859).

[6] Pursuant to Rule 32.1.1(a) of the Second Circuit's Local Rules of Practice such a summary order "do[es] not have precedential effect."

been coded by IGP staff:

> The Court:    Miss Gregory, as I understand it, once a grievance is filed, it becomes coded, titled, and investigated, is that correct?
> The Witness: Once it is issued a code, it is investigated.
> The Court:    Okay.  And what's the purpose of the code?
> The Witness: Grievance program – basically, the code is on the topic of the grievance.  There's 50 – like 55 codes.
> The Court:    All right.  And does something have to be coded in order for it to be considered or appealed?
> The Witness: Yes.

Gregory Testimony at pp. 33-34.  Additionally, there is no evidence that Plaintiff was ever advised of the availability of an appeal in light of his multiple requests for information regarding the status of his grievance.  *See* Exhibits D-5.  Even after writing to the Superintendent about the fact that grievances were not being processed the record shows only that Plaintiff's letter was referred for consideration, but there is no evidence of any response to that letter.

In light of the evidence adduced at the hearing, Plaintiff had no available remedy to him within the meaning of *Ross*.  *Hamlett v. Stotler*, 2019 WL 4306999, at *9 (N.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, 2019 WL 4305443 (N.D.N.Y. Sept. 11, 2019) ("[T]he Court finds any failure on Plaintiff's part to follow [the appeal process] is nonetheless excused under the Second Circuit's decision in *Williams* because the regulations themselves 'give no guidance whatsoever to an inmate' in Plaintiff's position. Instead, as Defendants' evidence demonstrates, the DOCCS IGP process 'is susceptible of multiple reasonable interpretations,' when it comes to pursuing a submitted-but-unfiled grievance.").

The Court finds informative several decisions rendered within the Northern District holding that, on other occasions during this same time period, inmates at the Clinton Correctional Facility were, or may have been, effectively barred from utilizing the grievance procedure in circumstances where their grievances were not received or processed. For example, in *Hamlett v. Stotler*, 2019 WL 4306999, at *5-6, the plaintiff testified that in two instances in 2014 he filed grievances with Clinton Correctional Facility's IGP, and then received back a letter from Supervisor Gregory indicating that her office had not received that grievance. After hearing the testimony, United States Magistrate Judge Thérèse Dancks concluded that the grievance program was effectively unavailable to the inmate in this submitted-but-unfiled situation. *Id.* at *9.

Next, in *Coleman v. Nolan*, 2018 WL 4732778, at *5, the testimony at the exhaustion hearing indicated that the plaintiff, who was an inmate at the Clinton Correctional Facility, wrote a grievance on December 4, 2014 and placed it in the facility mailbox with the assistance of a fellow inmate. When the plaintiff received no response to the grievance, he submitted a Freedom of Information Law (FOIL) request to the Facility for status information and also submitted a second grievance on December 30, 2014. *Id.* at *6. Hearing nothing, he FOILed for the status of that second grievance. *Id.* Supervisor Gregory testified that her office had no record of either grievance. *Id.* at *7. Judge Baxter in *Coleman* concluded that the inmate was credible and met his burden of production on this issue, and that his subsequent steps of filing FOIL requests concerning the status of the grievances provided strong corroboration of his claim, which was not effectively rebutted by

the Defendants. *Id.* at *8-10. Accordingly, the Court concluded that under *Williams* the grievance process was "unavailable" to Plaintiff. *Id.* at *11.

Finally, in *Curtis v. Bola*, 2017 WL 6767392, at *13 (N.D.N.Y. Nov. 28, 2017), *report and recommendation adopted*, 2018 WL 278673 (N.D.N.Y. Jan. 3, 2018), Judge Dancks took evidence on the issue of exhaustion and concluded that the credible evidence was that the plaintiff, a Clinton inmate, mailed appeals of his grievance denial to CORC in March of 2014 in accordance with the IGP, and for reasons unknown to him and through no fault of his own, those appeals did not end up in the Clinton Correctional Facility IGP files or with CORC, effectively rendering the IGP unavailable. *See also Berman v. Durkin*, 2017 WL 1215814, at *8.

After considering all the documentary evidence, and weighing the statements and demeanor of the witnesses at the hearing, I find that the Defendants have not satisfied their burden on the affirmative defense at issue. Rather, I find that the credible evidence establishes that Plaintiff did attempt to grieve the issues presented in this case on two separate occasions, by attempting to use the facility's mail system, and that those grievances were never filed or coded. Without that fundamental step, the IGP was, in practical terms, unavailable to Terry Daum.

I also find in favor of Plaintiff when considering the Defendants' final contention - that Plaintiff's First Amendment retaliation theory was not raised in his purported grievance. In support of that argument Defendants reference *Smart v. Goord*, 441 F. Supp. 2d 631, 639 (S.D.N.Y. 2006), which correctly notes that "the filing and exhaustion of a grievance does

not grant plaintiff leave to sue 'anyone who was in any way connected with the events giving rise to that grievance. The Court must examine whether plaintiff's grievance sufficiently alerted prison authorities that [she] was alleging some wrongdoing beyond [the facts specifically described in the grievance].'" (citing *Turner v. Goord*, 376 F. Supp.2d 321, 324-25 (W.D.N.Y. 2005)). In the present case, Mr. Daum's grievance not only included the facts of his alleged assault, but also specifically referenced the complaint about the misconduct of officers on "the flats" that was relayed to the facility through his family that very day, as well as his own complaint to Captain Devlin, which was then immediately followed by an alleged unconstitutional assault. Exhibit P-12. The Court's view is that this grievance, while not mentioning the First Amendment specifically, is sufficient to put the facility on notice of the wrongdoing that he was alleging. *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) ("[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.") (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). Indeed, this Court relied on the very same facts to conclude that the First Amendment claim had been stated. Therefore, Defendants' argument in this regard is rejected.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the District Court determine that the administrative remedies under DOCCS' IGP were rendered unavailable to Plaintiff and therefore his claims

in this action are not barred by the PLRA based upon his failure to exhaust, and that the

matter proceed to trial; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation

and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days[7] within which

to file written objections to the foregoing report. Such objections shall be filed with the

Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**(14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:  October 30, 2019
Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

---

[7] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

# APPENDIX

1          **C H R I S T I N E     G R E G O R Y,**

2     having been duly sworn by the Clerk of the Court, was

3     examined and testified as follows:

4     **DIRECT EXAMINATION BY MR. MITCHELL:**

5     Q    Miss Gregory, thank you for being here today.  Could

6     you please introduce yourself to the Court.

7     A    My name is Christine Gregory.  I'm Inmate Grievance

8     Program Supervisor at Clinton Correctional Facility.

9     Q    Okay.  So what department do you work for?

10    A    I work for the Inmate Grievance Department.

11    Q    Sorry, what state agency do you work for I should say?

12    A    Oh, Department of Correctional Services and Community

13    Supervision.

14    Q    Okay.  And is that known as DOCCS?

15    A    Yes.

16    Q    How long have you worked for DOCCS?

17    A    Twenty-three years.

18    Q    And which facility do you work in?

19    A    Clinton Correctional Facility.

20    Q    How long have you worked at Clinton Correctional

21    Facility?

22    A    Since January 2012.

23    Q    What is your current position?

24    A    Inmate Grievance Program Supervisor.

25    Q    How long have you been an Inmate Grievance Program

1    Supervisor at Clinton Correctional Facility?

2    A    Since January 2012.

3    Q    Can you tell me the responsibilities of your position?

4    A    I oversee the Inmate Grievance Program, which includes

5    the processing of grievances and appeals.

6    Q    And do you sometimes respond to correspondence from

7    inmates?

8    A    Yes.

9    Q    In your position, do you have any responsibilities for

10   maintaining records?

11   A    Yes.

12   Q    Can you tell me what records you maintain?

13   A    I keep track of all the grievances filed, which

14   includes the appeals.

15   Q    And do you also maintain some correspondence?

16   A    Yes.

17   Q    Can you briefly describe the different steps of the

18   DOCCS Inmate Grievance procedure?

19   A    When a complaint is received in the grievance office,

20   it is reviewed, and if it's acceptable, it is coded, titled

21   and investigated.  If it's a staff conduct grievance, it is

22   filed and then submitted to the Superintendent level and

23   investigated at that point.  If it's a nonstaff conduct

24   grievance, it is investigated and an IGRC hearing is

25   conducted and then IGRC response is issued and the responses

1    that are issued to the inmates, he has an opportunity to

2    appeal those to the next level.

3    Q    And what's the next level?

4    A    If it's a staff conduct, the next level after

5    Superintendent response would be a CORC, CORC level.  If

6    it's an IGRC response, the next level is the Superintendent

7    level and then it would be the CORC level.

8    Q    So back in April 2014 at Clinton Correctional Facility,

9    am I correct that you were one of the Inmate Grievance

10   Program Supervisors?

11   A    Yes.

12   Q    And at that time, did Clinton Correctional Facility

13   have a functioning Inmate Grievance Program?

14   A    Yes.

15   Q    So, back in April 2014 at Clinton Correctional

16   Facility, how would an inmate go about filing a grievance?

17   A    It would be submitted to the grievance office and then

18   processed, if applicable.

19   Q    Did there come a time when I asked you to conduct a

20   search of the grievance files at Clinton Correctional

21   Facility for any grievances related to an allegation that

22   staff used excessive force, failed to intervene and

23   retaliated against inmate Terry Daum at Clinton Correctional

24   Facility in April 2014?

25   A    Yes.

1    Q    Did you conduct that search?

2    A    Yes.

3    Q    And did you do that in August 2019?

4    A    Yes.

5    Q    Can you tell me a little bit about what you did to

6    carry out the search?

7    A    I searched the databases that the Inmate Grievance

8    Program has.

9    Q    And did you also look through your correspondence

10   records?

11   A    Yes.

12   Q    Did you conduct a thorough search?

13   A    Yes.

14          MR. MITCHELL:  Your Honor, I'd like to show the

15   witness what's marked as Exhibit D-4, also to ask if my

16   opponent will stipulate to its admission or not.

17          MR. CALLAN:  Your Honor, we just make the same

18   relevance objection, it deals with prior and past filing of

19   grievances.

20          THE COURT:  All right.  I'll issue the same

21   ruling, so I'll admit Exhibit D-4.

22                    (Defendant Exhibit 4 received.)

23          MR. MITCHELL:  Your Honor, if I could approach the

24   witness.

25          THE COURT:  You may.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

1   BY MR. MITCHELL:

2   Q    Ms. Gregory, can you identify Exhibit D-4?

3   A    Yes.

4   Q    What is it?

5   A    These are grievances previously filed by Inmate Daum at

6   Clinton Correctional Facility.

7   Q    And is this printout an accurate copy of your computer

8   listing, listings of Terry Daum's grievances filed at

9   Clinton Correctional Facility?

10  A    Yes.

11  Q    Ms. Gregory, based upon your search, did plaintiff

12  Terry Daum file a grievance at Clinton Correctional Facility

13  about an alleged use of excessive force at Clinton

14  Correctional Facility in April 2014?

15  A    No.

16  Q    Did plaintiff Terry Daum file a grievance at Clinton

17  Correctional Facility about an alleged failure to intervene

18  at Clinton Correctional Facility in April of 2014?

19  A    No.

20  Q    Did inmate Terry Daum file a grievance at Clinton

21  Correctional Facility about alleged retaliation at Clinton

22  Correctional Facility in April 2014?

23  A    No.

24  Q    In your search, did you locate any request by Terry

25  Daum for an extension of time to file a grievance about

1    alleged use of excessive force, failure to intervene or

2    retaliation at Clinton Correctional Facility in April 2014?

3    A    No.

4         MR. MITCHELL:  Your Honor, I'd like to show the

5    witness what's marked as Exhibit D-5.

6         MR. CALLAN:  Your Honor, just on this, while I

7    have no objection to these coming in, the only thing I would

8    like to point out is it appears to be a partial excerpt of

9    the conversations, correspondence going back and forth

10   between Miss Gregory and Mr. Daum, so I think we are missing

11   some of the additional letters.  If the Court wants me to

12   enter those later as a part of our case, I can do that, or

13   if the Court wants them to come in now, I don't know how you

14   want to treat that, your Honor.

15        THE COURT:  Well, ultimately, I'd like to see the

16   entire letters of the conversations back and forth.  Go

17   ahead, I will let Mr. Mitchell introduce what he thinks is

18   relevant, you can supplement the record and I'll review it

19   all at once at the end of the case.

20        MR. CALLAN:  Thank you very much, your Honor.

21        MR. MITCHELL:  So, your Honor, is D-5 admitted?

22        THE COURT:  D-5 is admitted.

23             (Defendant Exhibit 5 received.)

24        MR. MITCHELL:  I'd like to show this to the

25   witness, if I may.

 1            THE COURT:  You may.

 2    BY MR. MITCHELL:

 3    Q    So, Ms. Gregory, do you recognize Exhibit D-5?

 4    A    Yes.

 5    Q    What is it?

 6    A    Correspondence I replied to to the inmate, Daum.

 7    Q    Okay.  So are there four pages there?

 8    A    Yes.

 9    Q    And can you just briefly tell us what those four

10    documents are about?

11    A    Inmate Daum had requested the status of some complaints

12    that he alleged he had submitted to the grievance office and

13    I was replying to the status.

14    Q    All right.  So you have one letter from him, what's it

15    dated?

16    A    First letter is dated April 17, 2014.

17    Q    Okay.  And did you respond to that?

18    A    Yes.

19    Q    And when did you respond?

20    A    April 18, 2014.

21    Q    Okay.  And can you tell us basically what you said in

22    the response?

23    A    That there was no grievance on file.

24    Q    Anything else you said?

25    A    If it was within the time frames, he could submit it to

                    *THERESA J. CASAL, RPR, CRR*
              *UNITED STATES DISTRICT COURT – NDNY*

1  the grievance office.

2  Q    And then is there another letter from Inmate Daum?

3  A    Yes.

4  Q    And what's the date on that?

5  A    April 23, 2014.

6  Q    And what does that letter talk about?

7  A    Inquiring about complaints he submitted, two complaints

8  he submitted.

9  Q    And did you respond to that?

10  A    Yes.

11  Q    All right.  What's the date of your response?

12  A    April 28, 2014.

13  Q    Okay.  And can you tell us briefly what you said to him

14  in response?

15  A    That those complaints were not on file and he could

16  resubmit.

17  Q    Did you say anything about the time frame?

18  A    Yes.  If they were within the 21-day time frame.

19  Q    Did you say anything about mitigating circumstances?

20  A    Yes.  If it was not within the 21-day time frame, he

21  could submit with proof of mitigating circumstances to the

22  IGRC office.

23  Q    All right.  So we have these two letters from Inmate

24  Daum and then your two responses.  Is this the extent of the

25  correspondence you have on record from Inmate Daum about an

1  alleged incident in April 2014?

2  A    Yes.

3  Q    You searched your files and this is all you have,

4  right?

5  A    Yes.

6  Q    Do you remember getting any other correspondence from

7  Inmate Daum about an alleged incident in April 2014?

8  A    No.

9  Q    If you could look back and Exhibit D-4.  Am I correct

10  that prior to April 2014, Inmate Terry Daum had filed

11  grievances at Clinton Correctional Facility about various

12  issues?

13  A    Yes.

14  Q    So do you know approximately how many prior ones that

15  he has, if you could just count them?

16  A    Approximately 15.

17  Q    Based on that, that whole background of filing

18  grievance appeals, is it fair to say that Inmate Daum was

19  familiar with how to file a grievance at Clinton

20  Correctional Facility?

21  A    Yes.

22  Q    Now, from time to time in your position, have you

23  received grievances from inmates at Clinton Correctional

24  Facility who were in Involuntary Protective Custody?

25  A    Yes.

1    Q    Ms. Gregory, at any point, did you have animosity

2    towards Terry Daum?

3    A    No.

4    Q    Did anyone ever order you not to respond to grievances

5    filed by Terry Daum?

6    A    No.

7    Q    Did you ever receive an inmate grievance from inmate

8    Terry Daum and then refuse to process it?

9    A    No.

10    Q    Did you ever receive a grievance from Terry Daum and

11    destroy it?

12    A    No.

13    Q    Did you ever cover up a grievance filed by Terry Daum?

14    A    No.

15    Q    Ms. Gregory, when was Terry Daum transferred out of

16    Clinton Correctional Facility in 2014?  And I can show you

17    something to refresh your memory if you'd like.

18    A    Yes.

19    Q    Okay.

20         MR. MITCHELL:  Your Honor, I'd like to show the

21    witness what's marked as D-6 to refresh her memory.

22         THE COURT:  You may do so.

23    A    (Pause.)

24    Q    So, Ms. Gregory, having looked at that document, are

25    you now able to answer about when Terry Daum was transferred

1    out of Clinton Correctional Facility?

2    A    Yes.

3    Q    What was the date?

4    A    July 8, 2014.

5    Q    So, Ms. Gregory, I have no further questions.  Thank

6    you?

7            MR. CALLAN:  Your Honor, that exhibit, I don't

8    know if it's actually going to be entered, but the

9    objection -- the inmate disciplinary record not to be

10   entered.  We have no objection to the search locater.

11           THE COURT:  That document was not admitted, it was

12   only used to refresh the witness' recollection.  My

13   understanding was with the witness' recollection so

14   refreshed, she was then able to answer the question.

15           MR. CALLAN:  Thank you, your Honor.

16           THE COURT:  All right.  Any cross-examination,

17   Mr. Callan?

18           MR. CALLAN:  Yes, your Honor.

19   **CROSS-EXAMINATION BY MR. CALLAN:**

20   Q    When inmates arrive at Clinton Correctional Facility do

21   they receive training on how to file grievances?

22   A    They receive an inmate orientation.

23   Q    And as part of that orientation, is there lessons on

24   how to file grievances or instructions given to the inmates?

25   A    There is an orientation on the grievance process.

```
 1   Q     And does that process include informing inmates how to
 2   respond or appeal if they attempt to file a grievance and no
 3   response is given?
 4   A     No, I don't believe so.
 5   Q     And you had mentioned that Mr. Daum was in IPC.  Can
 6   you tell me how an inmate in IPC would file a grievance?
 7   A     He would submit it through the inter-facility mail.
 8   Q     And do they have access to that easily in IPC?
 9   A     That's the -- on the block.  I don't work on the block.
10   Q     Okay.  Do you know what time they're allowed in and out
11   of their cell in IPC?
12   A     No.
13   Q     Do you have any idea what the chain of custody of an
14   envelope that would be dropped in the grievance box, who
15   would pick that up?
16   A     That's done on the block and I'm not there when they
17   pick up the mail.
18   Q     So fair to say you don't pick up the mail on the block?
19   A     No, I don't.
20   Q     So it touches at least another person's hands before it
21   reaches you?
22   A     Yes.
23   Q     Can you refer back to Exhibit D-5, please.  In your
24   correspondence dated April 18, 2014, do you at any point
25   inform Mr. Daum what to do if his grievances are not being
```

1  accepted, filed or processed?

2  A    No.

3  Q    And if you look at your correspondence dated April 28,

4  2014, do you inform Mr. Daum what to do if his grievances

5  are not being filed, processed or responded to?

6  A    He was advised to submit a copy.

7  Q    But if his submissions were not being processed, did

8  you advise him what to do?

9  A    Submit a copy.

10  Q    And that would be within his 21-day time frame, is that

11  correct?

12  A    If the incident was within the 21-day time frame, he

13  could submit a copy.  If not, he could submit a copy with

14  proof of mitigating.

15  Q    So, your correspondence -- your first one dated

16  April 18, 2014, informs him you may submit your complaint if

17  it's within 21 days of the incident, correct?

18  A    Correct.

19  Q    And then your testimony is the next correspondence you

20  received from Mr. Daum is his April 23, 2014, letter, is

21  that correct?

22  A    Yes.

23  Q    And those are the only two pieces of correspondence you

24  received from Mr. Daum?

25  A    Yes.

1    Q    So, when he submitted this April 23, 2014, letter to

2    you, he was within 21 days of the April 4th incident, is

3    that correct.

4    A    Based on his correspondence then, he did not give the

5    incident date.

6    Q    Do you recall the incident date?

7    A    When I did these correspondences?

8    Q    No.  As you sit here today, do you recall what date the

9    incident occurred on?

10            MR. MITCHELL:  I just object.  I think the

11    question's vague.  Perhaps he could give more information.

12            THE COURT:  I think it's a perfectly legitimate

13    question.  Do you understand it?

14            THE WITNESS:  No, I do not understand it.

15            THE COURT:  All right.  Would you rephrase?

16            MR. CALLAN:  Yes.

17    BY MR. CALLAN:

18    Q    You're responding to Mr. Daum in your letters saying he

19    has 21 days to submit a grievance, is that correct, that was

20    21 -- is that correct?

21    A    Twenty-one days from the date of the incident.

22    Q    And do you recall what the date of the incident was in

23    this case?

24    A    I believe the date was April 4th.

25    Q    So my question again is:  He writes you on April 23rd,

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT – NDNY*

 1  that would be within the 21 days, is that correct?

 2  A    It would be at that time.  However, when I wrote the

 3  correspondence, I did not know the incident date.

 4  Q    So, Mr. Daum was writing you again on April 23rd,

 5  within the 21 days, inquiring for a second time into the

 6  status of his grievances, is that correct?

 7  A    Yes.

 8          MR. CALLAN:  Your Honor, can I just have one

 9  second to consult with Mr. Daum?

10          THE COURT:  You may.

11                  (Pause in proceedings.)

12          MR. CALLAN:  Your Honor, that's all we have, thank

13  you very much.

14          THE COURT:  Okay.

15          MR. MITCHELL:  Your Honor, I have no redirect.

16          THE COURT:  All right.  Well I have a couple

17  questions I'd like to ask the witness.  Miss Gregory, as I

18  understand it, once a grievance is filed, it becomes coded,

19  titled and investigated, is that correct?

20          THE WITNESS:  Once it's issued a code, it is

21  investigated.

22          THE COURT:  Okay.  And what's the purpose of the

23  code?

24          THE WITNESS:  Grievance program -- basically, the

25  code is on the topic of the grievance.  There's 50 -- like

1    55 codes.

2         THE COURT:  All right.  And does something have to

3    be coded in order for it to be considered or appealed?

4         THE WITNESS:  Yes.

5         THE COURT:  Now, you mentioned with regard to

6    complaints about staff assaultive conduct, that inmates are

7    grieving about the staff, that that goes directly to the

8    Superintendent, is that correct?

9         THE WITNESS:  After it's filed, yes.

10        THE COURT:  Do you know why, what the reason for

11   that is?

12        THE WITNESS:  That's per Directive 4040.

13        THE COURT:  Okay.  In this particular case, it

14   looks like you received two letters from Mr. Daum indicating

15   that he filed grievances, but they had not been responded

16   to, is that correct?

17        THE WITNESS:  That they weren't received or filed.

18        THE COURT:  Okay.  And did you understand at that

19   time that he was then in Involuntary Protective Custody?

20        THE WITNESS:  I don't know.

21        THE COURT:  Under those circumstances, would it be

22   your practice to send some sort of supervisor down to find

23   out why it was that the inmate was making a complaint and it

24   wasn't coming to you?

25        THE WITNESS:  No.

1           THE COURT:  Why not?

2           THE WITNESS:  Excuse me?

3           THE COURT:  Why not?

4           THE WITNESS:  Because I just advise them to submit

5    them.

6           THE COURT:  Okay.  All right.  That's all the

7    questions I have.

8           MR. MITCHELL:  Your Honor, can I just ask one

9    thing that came up?

10          THE COURT:  You may.

11   **REDIRECT-EXAMINATION BY MR. MITCHELL:**

12   Q    Ms. Gregory, you talk about how there's that expedited

13   procedure that some grievances go to the Superintendent, is

14   that right?

15   A    Correct.

16   Q    But for even that kind of a grievance, doesn't the

17   inmate have to file with the grievance program first?

18   A    Yes.  Yes, it has to be filed and given a grievance

19   number.

20   Q    So the inmate can't just skip the first step and send

21   something to the Superintendent, he still has to file at

22   step one, right?

23   A    Correct.

24          MR. MITCHELL:  Okay.  Thank you.

25          THE COURT:  All right.  Mr. Callan, anything

1    further you want to ask in light of my questions?

2         MR. CALLAN:  That is all, your Honor, thank you

3    very much.

4         THE COURT:  All right.  Miss Gregory, your work

5    here is done, you may step down, thank you very much.

6              (Witness was excused.)

7                   - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25